Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 8452 | **DATE** | 2/13/2003 |
| **CASE TITLE** | Dr. Sakharam D. Mahurkar vs. C.R. Bard, Inc., et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ■ Status hearing set for 4/22/2003 at 9:00 A.M..
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. The court denies Defendant C.R. Bard's motion for partial summary judgment (Doc. No. 18-1). Plaintiff Mahurkar's motion to strike the errata sheet of Timothy Ring (Doc. No. 48-1) is also denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 3 number of notices | |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | 2-18-03 date docketed | 94 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | 2/13/2003 date mailed notice | |
| ETV | courtroom deputy's initials | Date/time received in central Clerk's Office | ETV mailing deputy initials | |



| | |
|---|---|
| DR. SAKHARAM D. MAHURKAR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 01 C 8452 |
| ) | |
| C.R. BARD, INC. and BARD ACCESS ) | Judge Rebecca R. Pallmeyer |
| SYSTEMS, INC., and BARD HEALTHCARE, ) | |
| INC., ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Dr. Sakharam D. Mahurkar ("Mahurkar") is a medical doctor and an inventor of devices used in hemodialysis. Dr. Mahurkar is the named inventor on the two patents involved in this lawsuit, United States No. 4,808,155 (the "'155 patent"), for a "Simple Double Lumen Catheter" and No. 4,895,561 (the "'561 patent") for the "Dual Lumen Catheter Connecting System." (Defendant C.R. Bard's Rule 56.1(a)(3) Statement of Uncontested Material Facts ¶ 1, hereinafter "Def.'s 56.1"; Second Amended Complaint ¶¶ 7, 8.) Mahurkar filed this action on November 2, 2001, against Defendants C.R. Bard, Inc. ("C.R. Bard"), Bard Access Systems, Inc. ("BAS"), and Bard Healthcare, Inc. ("Bard Healthcare") for infringing those patents under 35 U.S.C. §§ 271(a), (b), and (c). Defendant C.R. Bard has moved for partial summary judgment of noninfringement, claiming that it does not make, use, sell, offer for sale or import any product accused of infringement in the lawsuit and therefore cannot be held directly liable under Section 271(a), direct patent infringement. C.R. Bard concedes that BAS, its subsidiary, sells the accused products, but argues that it cannot be held liable for the conduct of BAS. (Pl.'s 56.1 ¶ 17.) For the following reasons, the court denies C.R. Bard's motion.[1]

---

[1] Mahurkar has moved to strike the errata sheet of Mr. Timothy Ring, Group President of C.R. Bard, who provided a deposition in this case. In its response to the motion to strike, C.R. Bard asserted that the court need not consider the errata sheet in deciding the motion for partial summary judgment, thereby rendering Mahurkar's motion moot. Therefore, Mahurkar's motion to strike is denied, and the court has not considered it in reaching its decision on the current motion.

## FACTUAL BACKGROUND

In his Second Amended Complaint, Mahurkar claims that Defendants infringed both the '561 patent and the '155 patent by making, using, importing, distributing, selling and/or offering for sale a number of products, including: Flexxicon II Precurve catheters, Niagara curved catheters, Softcell curved catheters, Optiflow, Hemoglide, Niagara Slim-Cath and other catheter assemblies with a preformed bend in the catheter or catheter connecting system. (Pl.'s 56.1 ¶¶ 3, 4.) C.R. Bard claims that it does not "make, use, sell, offer for sale, or import the accused catheters," and therefore cannot be directly liable for patent infringement. (Def.'s 56.1 ¶ 15.)

C.R. Bard provides thousands of products and services in the areas of vascular, urology, and oncology disease management and also provides surgical specialty products. (Def.'s 56.1 ¶ 6.) C.R. Bard provides these products and services through a number of business units, including BAS, a direct subsidiary of C.R. Bard.[2] (Pl.'s 56.1 ¶ 11.) It is undisputed that C.R. Bard and BAS are legally distinct and separately incorporated entities. (Declaration of Jean Miller ¶ 7, Assistant Secretary of C.R. Bard, ex. A to C.R. Bard's Appendix in Support of Motion for Summary Judgment, hereinafter "Miller Decl.") Mahurkar contends that C.R. Bard is nevertheless liable because it intimately controls the business of BAS, including the research, development, design, testing, safety, quality assurance, promotion and distribution of the accused catheter products. (Pl.'s 56.1 ¶ 15.) In support of his argument, Mahurkar points to certain documents produced by C.R. Bard in confidence; information accessible on the internet; brochures and promotional information; and C.R. Bard's supervision over BAS regulatory and quality assurance issues.

### A. Confidential Documents

Roseanne Faraci, an attorney for Mahurkar, reviewed several documents and manuals provided by C.R. Bard during discovery pursuant to a "confidential-attorneys' eyes only"

---

[2] C.R. Bard's motion focuses on its relationship with BAS, not Bard Healthcare, but the court notes that Bard Healthcare is the entity that sells the catheters to BAS. (Deposition of Timothy Ring, Group President of C.R. Bard at 121, Attached to Pl.'s 56.1, hereinafter "Ring Dep.")

2

designation. Faraci concluded from her review that C.R. Bard exercises comprehensive control over its subsidiaries, including BAS, with respect to development, government regulatory compliance, safety evaluation, quality assurance, approval, marketing and sales of catheter products. (Faraci Declaration ¶ 6, attached to Pl.'s 56.1, hereinafter "Faraci Decl.") Ms. Faraci noted, further, that the documents set forth strict standards to which C.R. Bard's subsidiaries must adhere with respect to the use of the Bard trademark, product packaging and promotional literature, and numerous other aspects of its subsidiaries' business. (*Id.*) Because C.R. Bard objects to public disclosure of these documents, it is bound by Ms. Faraci's assessment of them.

B. **Internet**

A page from C.R. Bard's website, www.crbard.com/global/accesssystems.html, dated September 12, 2002, indicates that the Vascath and Niagara catheters are available for purchase through C.R. Bard's "business unit" BAS. (Ex. 14 to Faraci Decl.) The web page does not contain price information. It lists the BAS website, address (in Salt Lake City, Utah), and phone and facsimile numbers (with Salt Lake City area codes). C.R. Bard is headquartered in Murray Hill, New Jersey. (www.crbard.com.)

C.R. Bard requires all of its subsidiaries to provide direct links on their website to the C.R. Bard website. (Ring Dep. at 72, 76.) A document shown to Mr. Ring during his deposition (but not submitted to the court), entitled "Bard's website standards," indicates, according to Ring, that C.R. Bard wanted a "consistency of look" in accordance with C.R. Bard's corporate identity guidelines, to clarify for customers "that various subsidiaries or divisions are all part of C.R. Bard, Inc." (*Id.* at 77-78.) The BAS website (www.bardaccess.com) includes a Legal Notice at the bottom of the home page. Clicking on the words "Legal Notice" opens the page www.crbard.com/copyright/html which states: "The information, documents and related graphics published in this Internet site are the sole property of C.R. Bard, Inc." The notice also states that no use of the marks on this internet site "may be made without the prior, written authorization of C.R. Bard, Inc., except for the sole purpose of identifying the products or services originating from C.R. Bard, Inc." (Pl.'s 56.1 ¶ 23.)

3

C.  **Brochures and Promotional Information**

Mahurkar submitted a brochure to the court which advertises a variety of products, including the Optiflow catheter. The court presumes the brochure was published by C.R. Bard because "C.R. Bard, Inc." appears in the upper left hand corner of the cover page, and neither party has argued otherwise. (Ex. 14 to Faraci Decl.) Entitled "Advancing the Delivery of Health Care," the brochure states that C.R. Bard is dedicated to advancing health care in three major areas: urology, vascular, and oncology. (*Id.*) The brochure states: "In complement to these three areas, Bard also provides a complete line of advanced surgical specialty products, services and programs," and "Bard oncological products and services are designed for the detection, treatment, and management of various cancers. Products include specialty access catheters and ports . . . ." (*Id.*)

On one page of the brochure, C.R. Bard advertises "[o]ur new Opti-Flow Permanent Dialysis Catheters . . . ." (*Id.*) The top of this page features a "Bard" logo, which appears several times in the brochure. C.R. Bard owns the trademark to the logo, which consists of the word "Bard," in capital, outlined letters, creating a bold effect. The court will hereinafter refer to this as the "BARD logo." In a column on the right hand side of this page, the names and contact information for three companies, including BAS, are listed. The Salt Lake City address, phone number, and BAS's website are all included. The next page in the brochure features a table listing several products, each with a corresponding Bard division. C.R. Bard itself is not listed in conjunction with any product, and BAS is listed as the division corresponding to all catheter products in the table. The brochure does not define division, nor does it direct the reader to contact the division in order to purchase the product, although this is a logical conclusion. Below the table, readers are instructed: "For additional information on Bard products or services, call 1-800-FOR-BARD." (*Id.*) This phone number is staffed by a combination of C.R. Bard employees and employees of its subsidiaries and divisions.[3] (Ring Dep. at 129.) The BARD logo, the C.R. Bard address (in Murray Hill, New Jersey)

---

[3] The parties have not identified whether a caller, upon dialing this number, is
(continued...)

4

and the C.R. Bard website, are also listed at the bottom of this page. (*Id.*) The brochure states that Optiflow is a registered trademark of C.R. Bard. (*Id.*) No prices are listed in the brochure for any of the products.

Mahurkar also submitted a brochure giving "Placement Tips" for the Niagara and Niagara Slim-Cath Short Term Dialysis Catheter. (Ex. 19 to Faraci Decl.) The last page of the brochure bears the Bard logo, and states that "Niagara is a trademark of C.R. Bard, Inc., or an affiliate." (*Id.*) BAS is listed as the copyright holder of the brochure, and BAS' address and phone numbers are listed, apparently to enable consumers to order the products. (*Id.*)

Mahurkar has also furnished informational materials on a variety of catheter kits, including the Hemoglide PC-2 Kit, the Hemoglide Kit, the Opti-Flow Kit, the Soft-Cell Kit, and the Flexxicon and Flexxicon II Acute Dialysis Catheters. (Exs. 1-7 to Faraci Decl.) All of these materials bear the BARD logo. The kits all state that they were "[m]anufactured for: Bard Access Systems" and "[d]istributed by: [BARD logo]." (Exs. 1-6 to Faraci Decl.) A single page information sheet on the Flexxicon products does not mention BAS; rather, "Vas-Cath Incorporated" appears at the top of the sheet and the words, "[d]istributed by [BARD logo]" appear at the bottom. (Ex. 7 to Faraci Decl.)

## D.  Regulatory and Quality Control

Project funding for BAS's research and development must be approved by C.R. Bard. (Ring Dep. at 23.) C.R. Bard controls regulatory approval for BAS products, as well. Ring acknowledged that Susan Alpert, the Vice President of Regulatory Sciences for C.R. Bard, has responsibility for products manufactured or sold by BAS. (*Id.* at 42.) She supervises BAS employees who test products for government compliance and has final authority regarding submissions of BAS products to the Food and Drug Administration. (*Id.* at 66, 172.) Finally, C.R. Bard is also involved

---

[3](...continued)
transferred to a particular division, for example BAS, upon making a request for a specific product.

5

in BAS product quality assurance. Chris Ganser, Vice President of Quality Assurance at C.R. Bard, has final authority on whether a BAS product should be recalled or what type of action should be taken relative to some types of product problems. (*Id.* at 137.) If Mr. Ganser believes there is a problem with the quality of a BAS catheter, he can order additional testing on the product, or tell BAS to recall the product. (*Id.* at 138.)  As a matter of policy, BAS submits all product literature to C.R. Bard for review and approval. (*Id.* at 97.) In fact, Mr. Ring stated that BAS probably cannot introduce a new catheter into the marketplace without authorization from an employee of C.R. Bard. (*Id.* at 101.)

## DISCUSSION

### A. Standard of Review

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Rhone Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 271 F.3d 1081, 1084 (Fed. Cir. 2001); *Monarch Knitting Mach. Corp. v. Sulzer Morat GMBH*, 139 F.3d 877, 880 (Fed. Cir. 1998). "In determining whether there is a genuine issue of material fact, the evidence must be viewed in the light most favorable to the party opposing the motion, with doubts resolved in favor of the opponent." *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1364 (Fed. Cir. 2001), *quoting Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1307 (Fed. Cir. 1998). The moving party bears the burden of demonstrating the absence of all genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1985).

### B. C.R. Bard's Liability Under 35 U.S.C. 271(a)

Section 271(a) of the patent law states:

Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

35 U.S.C. § 271(a).  C.R. Bard argues that it cannot be liable under this section because it does

not itself make, use, offer to sell or sell any of the accused products. Mahurkar concedes that C.R. Bard does not make or sell the accused products, but maintains that C.R. Bard can be held liable under Section 271(a) for several reasons. First, Mahurkar argues that C.R. Bard is liable under what he dubs a "transition-specific" theory of vicarious or agency liability. Second, Mahurkar argues that there is at least a material dispute of fact regarding whether C.R. Bard uses, distributes or offers to sell the accused products, thereby warranting the denial of summary judgment.

### 1. The "Transition Specific" Theory

Mahurkar's "transition-specific" theory of liability appears to rest on two alternate grounds, which the court will refer to as two separate theories. First, Mahurkar argues that C.R. Bard is vicariously liable for the actions of its agent or subsidiary, BAS. Second, Mahurkar claims that C.R. Bard and BAS are joint tortfeasors, and thus C.R. Bard may be found directly liable under Section 271(a).

#### a. Vicarious Liability

As for Mahurkar's theory that C.R. Bard is vicariously liable for the actions of BAS, the Federal Circuit has held that a corporate parent is liable for infringement by its subsidiary under 35 U.S.C. § 271(a) only if the evidence reveals circumstances justifying disregard of the status of parent and subsidiary as distinct, separate corporations. See *A. Stucki Co. v. Worthington Industries, Inc.*, 849 F.2d 593, 596-97 (Fed. Cir. 1988); cf. *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1579 (Fed. Cir. 1986) (corporate officers may be held personally liable for the conduct of the corporation under § 271(a) only by invocation of general principles relating to piercing the corporate veil). "Mere ownership of stock is not enough to pierce the corporate veil," however. *A. Stucki Co.*, 849 F.2d 596, citing *Milgo Elec. Corp. v. United Business Communications*, 623 F.2d 645, 662 (10th Cir. 1980). Mahurkar does not argue that piercing the corporate veil is appropriate in this case, and the court agrees the facts do not warrant such an approach here.

Mahurkar also seeks to hold C.R. Bard liable under 35 U.S.C. § 271(b), which imposes liability on anyone who "actively induces" patent infringement. To succeed on this theory, Mahurkar

7

will have to demonstrate that C. R. Bard's actions induced infringement on the part of others and that C. R. Bard knew or should have known its conduct would induce actual infringement. Circumstantial evidence may be sufficient to prove C. R. Bard's intent to induce infringement. *See Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363 (Fed. Cir. 2003).

C. R. Bard has not sought summary judgment on Mahurkar's § 271(b) claim, however. With respect to Mahurkar's claim under § 271(a), C. R. Bard is vicariously liable for its subsidiary's conduct only if it can pierce the corporate veil, a showing Mahurkar has not made.

### b. Joint Tortfeasor Theory

The joint tortfeasor theory is probably the one that fits more comfortably under the heading "transition-specific." The theory was developed in *Kingston Dry Dock Co. v. Lake Champlain Transp. Co.*, 31 F.2d 265, 267 (2d Cir. 1929), a libel case, in which Judge Learned Hand concluded that a parent corporation may be liable for the libelous acts of its subsidiary where the parent was an "actor" in a given transaction giving rise to the libel action. *Id.* Mahurkar has also pointed out more recent patent case law indicating that "[w]here the infringement is the result of the participation and combined actions of the defendants, they are joint infringers and are jointly liable for the infringement." *McDermott v. Omid Int'l, Inc.*, 723 F.Supp. 1228, 1236 (S.D. Ohio 1988); citing *Shields v. Halliburton Co.*, 493 F.Supp. 1376, 1389 (W.D. La. 1980) (additional citations omitted).

The court agrees that this is a viable theory under Section 271(a). To proceed under that theory, however, Mahurkar must first show that C.R. Bard itself engaged in one of the activities prohibited by Section 271(a). Otherwise C.R. Bard and BAS would not be "joint" tortfeasors. Evidence that C.R. Bard executives closely monitor BAS's activities (which Mahurkar certainly has offered here) is insufficient on its own to support a finding of joint tortfeasor liability. *Shields*, 493 F.Supp. at 1389. If Mahurkar is unable to prove that C.R. Bard used or offered for sale any of the accused patents, then at most C.R. Bard can be liable for inducement of infringement, which would not support a finding of liability under Section 271(a). As explained below, the court concludes that

8

Mahurkar has demonstrated genuine issues of fact concerning C.R. Bard's use or distribution of the actual products, making the "joint tortfeasor" concept a viable theory for recovery under Section 271(a).[4]

## 2. Does Bard Use, Distribute, or Offer the Accused Products?

### a. Offer to Sell

The court finally considers whether any material disputes of fact exist regarding whether C.R. Bard has engaged directly in any of Section 271(a)'s prohibited activities. Plaintiff argues first that C.R. Bard directly infringes the patents-in-suit by offering to sell the accused catheters.

A brief look at the statute's history is enlightening here. In 1993, the United States completed negotiations on the GATT Uruguay Round Trade Related Aspects of Intellectual Property ("TRIPS") agreements. *Rotec Industries, Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1251 (Fed. Cir. 2000). As a result of the negotiations, the United States agreed to impose additional infringement liability in its patent law for "offers to sell." In 1994, Congress enacted a statute, effective January 1, 1996, to satisfy the nation's pledge under TRIPS. *Id.* Congress offered little guidance as to the meaning of the phrase, however, and there is little case law from the Federal Circuit defining the term "offer to sell." *Id.* at 1252.

The Federal Circuit has noted that the provision's underlying policy is to prevent a competitor from generating interests in a potential infringing product to the commercial detriment of the rightful patentee. *3D Systems, Inc. v. Aarotech Laboratories, Inc.*, 160 F.3d 1373, 1379 (Fed. Cir. 1998). More recent pronouncements refine this arguably broad definition of "offer to sell." In *Rotec Industries*, 215 F.3d at 1254-55, the court stated that "offer to sell" liability should be determined according to the norms of traditional contract analysis, and observed that "[i]n the absence of a communication with a third party, it is difficult to imagine any commercial detriment

---

[4] The court notes the distinction between the joint tortfeasor theory of recovery and the tort law concept of joint and several liability, under which two or more parties are held responsible for a tort because it is impossible to distribute responsibility accurately.

9

of the rightful patentee taking place." *Id.* at 1255. In *Rotec Industries*, the patentee sued under Section 271(a) after the defendant submitted a bid proposal to the Chinese government for a concrete placing system. *Id.* at 1249. The bid proposal, including the description of the product and the proposed price, was finalized in Hong Kong and presented in China. All negotiations with the Chinese government prior to signing the agreement took place in China, and the agreement was signed in China. *Id.* at 1250. The court held that the defendant could not be liable under Section 271(a) because the defendant's offer (the bid proposal) was made outside of the United States. The court stated that the patentee had adduced no evidence showing that any defendant communicated a "manifestation of willingness to enter into a bargain [in the United States] so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Id.* at 1257, citing *Restatement (Second) of Contracts* § 24 (1979).

In this case, the court concludes that at most, Mahurkar has demonstrated that C.R. Bard advertises the accused products. He has not shown that C.R. Bard actually offers them for sale. The C.R. Bard website does not provide specific information on the accused products, nor does it include prices. Instead, it directs potential customers to BAS for additional information by indicating that BAS is the business unit responsible for catheter products. The brochure advertising the Optiflow catheter does indicate that the product is offered by C.R. Bard, but it does not include price information, making it difficult for a prospective buyer to "accept" the alleged "offer." The brochure is, thus, more analogous to an advertisement than an offer, serving to prompt consumers to seek out additional information on the product. *See Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1048 (Fed. Cir. 2001), citing *Restatement (Second) of Contracts* §§ 26 (1981) ("[C]ontract law traditionally recognizes that mere advertising and promoting of a product may be nothing more than an invitation for offers, while responding to such an invitation may itself be an offer."). The communications on the C.R. Bard website and in the brochure, although they do provide customers with some information about the accused products, do not reveal C.R. Bard's requisite intent to be bound, an essential aspect of an offer.

10

The court notes that the Federal Circuit has yet to rule on whether an advertisement is sufficient to be considered an offer to sell under Section 271(a). *Hollyanne Corp. v. TFT, Inc.*, 199 F.3d 1304, 1309, n. 6 (Fed. Cir. 1999). Given its more recent analysis of "offer to sell" in *Rotec Industries*, it appears likely that for the Federal Circuit to consider an advertisement to be an offer, at the very least the advertisement must contain detailed product and pricing information. In this case, neither the website nor the brochure enables a consumer to make an informed choice to purchase one of the accused products. A prospective buyer might call the 1-800-FOR-BARD toll-free number, but Mahurkar has not provided the court with information about what information and services are available to callers. He has not indicated whether callers are able to obtain more specific information about the catheters, nor whether they may order the products through this number. For these reasons, the court concludes that there is not enough information in the advertisements that would allow a consumer to assent to enter into a bargain.

### b. Use or Distribution

Mahurkar also argues that C.R. Bard is liable under Section 271(a) because it uses the accused products, both by distributing and testing them. "Use" of a patented invention is defined broadly. *See Roche Prods., Inc. v. Bolar Pharm. Co.*, 733 F.2d 858, 861 (Fed. Cir. 1984) ("Section 271(a) prohibits, on its face, any and all uses of a patented invention."). Mahurkar correctly points out that distributing products falls under Section 271(a). *LG Electronics, Inc. v. First Intern. Computer, Inc.*, 138 F.Supp.2d 574, 585 (D. N.J. 2001). The Federal Circuit has not clarified whether distribution falls under the "use" or the "sell" provision of the statute, but since Mahurkar does not contend that C.R. Bard actually sells the accused products, the court will consider his suggestion that distribution may be a use under the statute. C.R. Bard urges that BAS distributes the catheters, and states that the only evidence to the contrary are the documents stating "distributed by Bard" featuring the BARD logo. Although the court agrees with C.R. Bard that this is not overwhelming evidence of distribution, Mr. Ring himself stated in his deposition that C.R.

11

Bard distributes these products.[5] (Ring Dep. at 155.) It is possible that as this case proceeds, C.R. Bard will be able to prove that it does not in fact distribute the products. Given that C.R. Bard requires the BARD logo to appear on most if not all of its subsidiaries' literature, it is conceivable that the "distributed by Bard" language refers to BAS, not C.R. Bard. In ruling on a motion for summary judgment, however, the court is required to view the evidence in the light most favorable to the non-moving party. The court concludes here that there is a material dispute as to whether C.R. Bard distributes the accused products.

Mahurkar also argues that C.R. Bard tests the accused catheters, another "use" under Section 271(a) of the statute. The Federal Circuit has established that testing is a use of an invention that may infringe under this section. *Roche Prods*, 733 F.2d at 863. Although the record is not saturated with evidence of testing by C.R. Bard, Mahurkar has provided enough evidence to overcome summary judgment on this issue as well. In his deposition, Mr. Ring discussed the roles of various C.R. Bard officers in the development of BAS products and literature. Mr. Ring stated that Ms. Alpert, the Vice President of Regulatory Sciences for C.R. Bard, is responsible for the BAS employees who test products for government compliance, and she has authority regarding submissions of BAS products to the Food and Drug Administration. (Ring Dep. at 42.) Mr. Ganser, the Vice President of Quality Assurance for C.R. Bard, has the final authority on problems relating to BAS products, and he may order a recall of BAS products. (*Id.* at 137.) Mr. Ganser may also order additional testing of a product if he wishes. (*Id.* at 138.) Mr. Ring testified at his deposition that BAS most likely cannot introduce a new catheter into the marketplace without authorization by an employee of C.R. Bard. (Id. at 101.) These facts do not conclusively demonstrate that C.R. Bard employees test the accused catheters. C.R. Bard's simple denial that it tests, however, is not enough to overcome the possibility raised by this evidence that C.R. Bard does actually test the

---

[5] Mr. Ring seeks to correct this statement in his errata sheet. As noted previously, however, Defendant agrees that the court may consider Mr. Ring's uncorrected testimony for purposes of this motion.

accused products. And the fact that executive level employees of C.R. Bard are so intimately involved in the design and testing of BAS products is a strong indication that C.R. Bard plays a major role in the testing of such products. If C.R. Bard is able to prove that it did not actually test any of the accused products, then it may be liable at most for inducement of infringement under Section 271(b). At this stage, however, because Mahurkar has demonstrated a dispute of fact as to whether C.R. Bard tests the accused catheters for quality assurance and government compliance, C.R. Bard's motion for summary judgment is denied.

## CONCLUSION

For the foregoing reasons, the court denies Defendant C.R. Bard's motion for partial summary judgment (Doc. No. 18-1). Plaintiff Mahurkar's motion to strike the errata sheet of Timothy Ring (Doc. No. 48-1) is also denied.

ENTER:

Dated: February 13, 2003

REBECCA R. PALLMEYER
United States District Judge